Filed 10/21/24  P. v. Van Es CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>THOMAS KIRK VAN ES,<br><br>    Defendant and Appellant. | F086034<br><br>(Super. Ct. No. VCF430094)<br><br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Tulare County.  Nathan G. Leedy, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

---

[*]    Before Poochigian, Acting P. J., Franson, J. and Smith, J.

-ooOoo-

Appellant and defendant Thomas Kirk Van Es was found guilty by a jury of first degree murder with related true findings on two firearm allegations. The trial court sentenced defendant to an aggregate term of 50 years to life.

Defendant's appointed counsel filed an opening brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436, identifying no error and asking this court to conduct an independent review of the record on appeal. Defendant was invited to submit a letter stating any grounds for appeal, but he failed to do so within the time allotted. We conducted an independent review of the entire record and find no error. We affirm.

## PROCEDURAL SUMMARY

On July 11, 2022, the Tulare County District Attorney filed a single count information charging defendant with the murder (Pen. Code,[1] § 187, subd. (a)) of K.V. The information further alleged defendant personally and intentionally discharged a firearm causing great bodily injury and death to K.V. (§ 12022.53, subds. (b), (c) & (d)) and personally used a firearm (§ 1203.06, subd. (a)(1)).

On February 6, 2023, the jury found defendant guilty of first degree murder. The jury also found true the allegations that defendant personally and intentionally discharged a firearm resulting in death in the commission of the murder (§ 12022.53, subd. (d)) and personally used a firearm.

On March 23, 2023, the trial court held a sentencing hearing. Defendant had filed a statement in mitigation asking the court to stay the sentence on the firearm enhancement. The court denied this request and sentenced defendant to 50 years to life consisting of 25 years to life for the murder with an additional 25 years to life for the firearm enhancement.

On March 30, 2023, defendant filed a notice of appeal.

---

[1]     All further statutory references are to the Penal Code.

2.

**FACTUAL SUMMARY**

Defendant and K.V. knew each other for 13 years before they married in March 2020. K.V. had two teenage children, Dustin and Justine, from a previous relationship but only Dustin lived with defendant and K.V.

Defendant and K.V.'s marriage was volatile with frequent arguing. K.V.'s brother, Daniel, testified that once when defendant and K.V. were fighting, Daniel and his wife, Tamara, were called over to the house to calm down the situation. After defendant left, Daniel and Tamara also left. Defendant later told Daniel he pinned K.V. down because she would not answer his questions. Defendant held K.V. down until she answered his questions about her alleged drug use. Regarding this incident, defendant testified he had caught K.V. with cocaine earlier in the month and then found more. Defendant wanted K.V. to tell him where she was getting her cocaine because he wanted to help her. Defendant testified he rolled over in bed and put his arm around K.V. while asking her where she was getting cocaine. He applied slight pressure on K.V. with his arm but denied K.V. indicated he was causing her pain.

Another time, Dustin called Tamara and asked if she and Daniel could come to the house to get in the middle of defendant and K.V. Dustin sounded frantic and upset on the phone. The couple was fighting, and defendant threw a fan at K.V. Defendant claimed he stubbed his toe on the fan while the couple was fighting and threw the fan against the wall. Defendant denied that he threw the fan at K.V.

Defendant and K.V. separated in January 2022. After they separated, defendant moved into his mother's house in Visalia. K.V. told Tamara that she "wanted it over," was "done," and had filed for divorce. Defendant testified however that he and K.V. continued to see each other after their separation including taking trips together and being sexually intimate. Defendant testified K.V. was secretive about their continued contact and wanted to keep it between the two of them. He would deny to anyone other than family or friends that the two were seeing each other. Defendant was aware K.V. was

3.

dating because she had told him. He claimed to be unbothered K.V. was seeing other men, but that K.V. was bothered defendant was seeing other women.

On June 9, 2022, K.V.'s cell phone showed she and defendant exchanged text messages starting at 4:54 p.m. The messages began with defendant asking K.V. for her personal email address. K.V. responded with her email address and the exchange continued as follows:

[K.V.]: " 'Why?' "

[Defendant]: " 'Thank you.' "

[K.V.]: " 'Y do you need it?' "

[K.V.]: " 'Next time I won't send info without asking first. Who know[s] what you will do with it.' "

[Defendant]: " 'I'm going to send you an email. That's all.' " [¶] … [¶]

[Defendant]: " 'That is all [I] want it for. Nothing else.' "

[Defendant]: " 'Care to talk?' "

[K.V.]: " 'Call.' "

[Defendant]: " 'Sure.' "

[Defendant]: " 'Call or in person?' "

The last message was time stamped at 7:03 p.m. Video surveillance of defendant's mother's residence showed defendant's truck leaving the driveway at 7:25 p.m.[2] Defendant continued the text message exchange with K.V. at 7:59 p.m.:

[Defendant]: " 'If I said spot, what would you do?' " [¶] … [¶]

[K.V.]: " 'I'm at my mom's right now handling stuff.' "

---

[2]     The Visalia Police obtained the contents of a digital video recorder from the mother's residence pursuant to a search warrant. The prosecution submitted several video recordings as Exhibit 40. Defendant was aware of the cameras around his mother's residence.

[Defendant]: " 'Okay.  So after dark?' "

[Defendant]: " 'I like to talk in person.' "  [¶]  …  [¶]

[K.V.]: " 'I'm leaving mom's.' "

[Defendant]: " 'So?' "

[K.V.]: " 'If you want to talk a min, [*sic*] we can.' "

[Defendant]: " 'Spot?' "

[K.V.]: " 'Yeah.' "

[Defendant]: " 'Okay, leaving here in ten.' "

[K.V.]: " 'We need to make it short and sweet.  I'm not trying to be an [a**]. [¶]  …  [¶]  But I am trying to move on and I have been seeing someone.' "  [¶]  …  [¶]

[Defendant]: " 'I get it 20 away.' "

Defendant's last text message was sent at 8:49 p.m.  " '[S]pot' " refers to a place where defendant and K.V. would usually meet up to hang out.  Defendant denied he was upset by K.V.'s message she was seeing someone.

At 8:14 p.m., video showed defendant approached his truck's driver's side door holding something in his left hand and a square-shaped object protruding from his left hip.  Defendant testified this object was a truck sunshade he wanted to offer to K.V. Defendant placed a long object behind the seat of his truck.  At 8:52 p.m., defendant reached into the truck's cab and turned on the truck's interior lights.  The lights illuminated the inside of the truck and showed a box with an " 'R' " on it on the center console.  Defendant admitted this was a box of ammunition and testified he intended to give the ammunition to K.V.[3]  Defendant drove his truck out of his mother's driveway at 8:54 p.m.

Defendant gave his account at trial of what occurred when he and K.V. met on the

_____

[3]     K.V. owned firearms including a 12-gauge shotgun.

night of June 9, 2022. K.V. was already at their spot when defendant arrived. After he arrived, defendant and K.V. sat on the tailgate of defendant's truck for about 40 minutes. They smoked cigarettes and defendant drank two beers. Defendant talked to K.V. about being a better person for her next relationship. Defendant and K.V. agreed they would miss their intimacy. K.V. reportedly offered to have sex with defendant one last time and defendant accepted. K.V. got down on her knees and began to perform oral sex on defendant. After a few minutes, defendant looked down because he noticed K.V.'s watch lit up. Defendant said he saw a shotgun barrel coming up towards him as K.V. was pointing a shotgun at him from her left side. He reportedly grabbed the gun and pointed it away from him. The shotgun went off. Defendant could not see if K.V. was hit and did not verify if she had been hurt. Defendant heard K.V. breathing and grunting after the gun went off so he did not believe he needed to check if she was okay. Defendant denied he ever hurt K.V. or intended to physically harm her. After the gun went off, defendant cursed, waddled back to his truck with his pants down, threw the shotgun in the back of the truck, and drove away. Defendant never looked back at K.V. to see if she was injured. Defendant stopped on his way home to think for about 20 minutes and then drove home.

Video showed defendant backed his truck into the driveway of his mother's residence at 11:24 p.m. that night. A black pump action shotgun can be seen in the bed of defendant's truck. At 11:26 p.m., defendant came around to the truck's passenger side and retrieved the shotgun from the truck bed. Defendant put the shotgun in his mother's garage.

The next morning on June 10, 2022, K.V.'s body was discovered near her truck in a dirt field on Road 68 between Avenue 280 and Avenue 288. K.V.'s body was located at the "spot" where defendant and K.V. would usually meet up. K.V. had gunshot wounds on the right side of her head and right hand. Her right hand had been partially mutilated by a shot traveling through her hand and into her head. Birdshot pellets were found in K.V.'s head and right hand. K.V.'s clothing was clean except for dirt patches on both

6.

knees indicating she had been kneeling. There was a blue cup by K.V.'s right knee and sunglasses by her left knee. The police identified K.V. by an identification badge with her name and photograph located in her truck.

Six cigarette butts were collected at the crime scene and tested for DNA. Three of the butts contained defendant's DNA, two contained K.V.'s DNA, and no DNA was detected on the sixth butt.

The police contacted Daniel who identified defendant as K.V.'s spouse. The police obtained a search warrant to ping[4] defendant's phone to get his location. Defendant was found at a mechanic shop in Visalia and taken to the Visalia Police Department headquarters.

The police obtained defendant's truck when he was arrested. A black shotgun was found inside the truck under a green towel, hard hat, and other items. A records check of the shotgun's serial number did not identify a registered owner. A fingerprint on the shotgun's barrel matched defendant's right index finger. A sample of blood on the shotgun was collected but was not analyzed for DNA due to contamination by a lab employee. A box of 12-gauge Rio King load ammunition was found under the passenger's side seat of defendant's truck. The box had a big "R" on its side and contained 12 rounds. The ammunition was birdshot for game birds. A spent 12-gauge shell casing of the same type of ammunition fell out of the shotgun when the police opened its pump action.

After advising defendant of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, the police interviewed defendant. The interview was audio and video recorded, and the recording played for the jury. When the police asked defendant what he did the previous day after work, defendant said he went home, got in the pool, had a couple

---

4      "Pinging" a person's cell phone is a technological method to obtain the phone's location.

beers, went back in the pool, and then watched a baseball game on his laptop. Defendant said he also went to a friend's house, but she was not there so defendant got more beers and went home. Defendant claimed he then stayed home until he went to work early the next day. Defendant told the police he and K.V. were divorcing but he still "love[s] her" and "wanna be with her." He said the couple split up in January because defendant caught K.V. cheating. Defendant reported he and K.V. continued to spend time together after their split. Defendant said the couple was "working it out" but K.V.'s kids did not know because K.V. was "a very secretive person." K.V. purportedly text messaged defendant the day before to ask if he could come get some of his stuff, but he responded he could not that day. Defendant said they talked on the phone and text messaged and were going to meet up but denied they did so. After the police told defendant K.V. had been found deceased, defendant persisted in denying he had met with her the previous night. Defendant told the police he was going to meet K.V. at their spot but claimed he never left the house. Defendant testified he lied to the police because of the couple's pact to keep secret their continued contact.

## DISCUSSION

As discussed above, defense counsel filed a *Wende* brief identifying no basis for relief and asking that we review the record to determine if there were any arguable issues on appeal. Pursuant to *Wende* and *People v. Kelly* (2006) 40 Cal.4th 106, we have conducted a thorough review of the record, including the video surveillance recordings admitted as an exhibit. Consistent with *Kelly*, we have provided a brief description of the facts and the procedural history of the case, the crimes for which defendant was convicted, and the punishment imposed. (*Kelly*, at p. 110.) We conclude there are no arguable issues on appeal and affirm the judgment. (*People v. Wende*, *supra*, 25 Cal.3d at pp. 441–443.)

## DISPOSITION

The judgment is affirmed.

8.